USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/19/24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――――x

UNITED STATES OF AMERICA

      v.                                09 CR 558-01 (CM)

JAMES CROMITIE,

            Defendant.
―――――――――――――――――――――――x

DECISION AND ORDER ON DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

McMahon, J.:

      In October 2010, James Cromitie, together with David Williams, Onta Williams, and Laguerre Payen, was convicted of conspiracy to use weapons of mass destruction, conspiracy to acquire and use anti-aircraft missiles, conspiracy to kill officers and employees of the United States, three counts of attempted use of weapons of mass destruction, and one count of attempted acquisition and use of anti-aircraft missiles— all in connection with their participation in an FBI-orchestrated conspiracy to "bomb" a Jewish community center in the Bronx and to "destroy military aircraft" at the New York Air National Guard Base at Stewart Air Force Base. For these crimes, Cromitie and his codefendants were sentenced in 2011 to a mandatory minimum term of 25 years imprisonment; the term was dictated by the charges relating to Stewart.

      Before the Court is Cromitie's motion asking the Court to reduce his sentence on compassionate release grounds, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Cromitie submits that he should be granted compassionate release based principally for the reasons that justified the sentence reduction of Cromitie's codefendants: that the Government-engineered minimum sentence of twenty-five years—based on the Government's decision to include in its plan a conspiracy to shoot down military aircraft with phony "stinger missiles" created by the

1

Government—constituted "extraordinary and compelling circumstances" warranting relief. Cromitie CRM at 1.[1]

The Government opposes Cromitie's motion. It argues—as it argued in opposition to the codefendants' motions—that the mandatory-minimum sentence the court was required to impose on the defendants was neither the product of Government misconduct nor Government manipulation. That of course is errant nonsense; but as no representative of the Government who worked on this motion was involved in engineering the Newburgh Four operation, I attribute that argument to a lack of familiarity with what actually transpired.

The Government also contends that there is special reason to deny Cromitie's motion: because Cromitie unlike his codefendants, was recorded making anti-Semitic and anti-Government statements during the course of the "investigation sting operation;" because he recruited his co-defendants to participate in the plan; and because he was tasked with planting the purported explosive devices.

Finally, the Government suggest that, unlike his codefendants, Cromitie has failed to provide evidence that would prove to the Court either that he was rehabilitated or has a satisfactory release plan. Government Opposition at 1.

---

[1] The codefendants' motions actually raised a variety of arguments that were litigated on their direct appeals and subsequent § 2255 habeas petitions; for example, they argued that they should be released because their convictions were the consequence of an abusive, selective and racist prosecution. Of course, arguments that attack the validity of a defendant's underlying convictions are not appropriately considered on a motion for compassionate release, see *United States v. Amato*, 48 F.4th 61, 63 (2d Cir. 2022), and the Court did not consider them.

However, Mr. Cromitie's codefendants assigned a number of other grounds for granting them compassionate release, including their claim that Government-engineered mandatory minimum sentence imposed on them, while legal, was overly harsh and unjust; the effects of confinement during the COVID pandemic; rehabilitation over the 14 years they have been incarcerated; and various health related concerns. Cromitie asserts similar issues in support of his own motion—issues that are properly before the court, and the issues upon which I will rule.

I have considered all arguments. Cromitie's motion is granted.

How The Government Created a "Terrorist"

There is no need to rehash in detail how the crimes of conviction came to be. The reader unfamiliar with this notorious case is referred to my decision denying the defendants' motion to set aside their convictions. *See United States v. Cromitie*, 781 F. Supp. 2d 211, 225 (S.D.N.Y. 2011), aff'd, 727 F.3d 194 (2d Cir. 2013). For our purposes, suffice it to say the following: James Cromitie was the object of a lengthy sting operation conducted by the FBI with the aid of a most unsavory "confidential informant," Shaheed Hussain.[2] Hussain's task was to infiltrate upstate mosques (attended largely by members of the Black Muslim movement within Islam) and identify potential terrorists. Cromitie, a small time grifter and petty drug dealer with no history of violence, pretended to be one, feeding Hussain lie after lie about his past and ingratiating himself with the man he believed to be a wealthy Pakistani businessman. Over a period of about eight months, Hussain inveigled Cromitie with promises of both heavenly and earthly rewards, including as much as $250,000, if he would plan and participate in, and find others to participate in, a jihadist "mission." Cromitie professed interest in Hussain's plan, often employing the same deeply offensive anti-Semitic and anti-American rhetoric that Hussain himself used, but he backed those words with absolutely nothing in the way of deeds. Cromitie strung Hussain along for six months,

---

[2] As was revealed on cross examination, in the years prior to his becoming an FBI asset, Hussain engaged repeatedly in activity that constituted various crimes, including bankruptcy fraud, tax evasion, immigration fraud, perjury and mail fraud. He lied repeatedly to a laundry list of government agencies, from the United States Bankruptcy Court for the Northern District of New York, to the sentencing judge in his criminal case, his Probation Officer, the FBI, the INS, the IRS, the New York State Liquor Authority and the New York State Education Department. He even lied on the witness stand at the trial of this case, putting the Government in the uncomfortable position of not being able to rehabilitate certain aspects of his testimony or adopt certain of his statements when arguing the case. More recently, Hussain was the owner of a car-for-hire business in Upstate New York that rented a defective stretch limousine – a vehicle that had been ordered out of service following a safety inspection–that hurtled down Route 30 in Schoharie, New York, sending 21 innocent people to their deaths. Newman, Weiser and Rashbaum, "Limo Company Owner in Crash Revealed as FBI Informant, Recruiter of Terrorists, Fraudster," *New York Times* (Oct. 9, 2018), available at https://www.nytimes.com/2018/10/09/nyregion/limo-owner-fbi-informant-shaheed hussain.

at which point he simply disappeared for so long a period that the FBI started to move on to other ventures.

However, in early April 2008, Cromitie—unemployed and broke—reached out to Hussain and agreed to participate in a "mission." Over the course of the next few weeks, under Hussain's direction, he recruited David and Onta Williams and Laguerre Payen, to serve as "lookouts" while Cromitie planted "bombs" manufactured by the FBI at a synagogue and community center in Riverdale. None of these three defendants had any history as terrorists; like Cromitie, they were impoverished small time grifters and drug users/street level dealers who could use some money. Payen in particular was of questionable mental acuity. The three men were recruited so that Cromitie could conspire with someone; the real lead conspirator was the United States, but Cromitie could not conspire with the Government.

Nothing about the crimes of conviction was of defendants' own making. The FBI invented the conspiracy; identified the targets; manufactured the ordnance; federalized what would otherwise have been a state crime (the Bronx "bomb" plot) by driving three of the four men (Onta Williams was not available) into Connecticut to view the "bombs" and "stinger missile launchers" that would be used in the "operation;" and picked the day for the "mission" (which was filmed in real time so it could be shown on television news the night the men were arrested). On May 20, Hussain drove the four men to Riverdale (they had no way to drive themselves); "armed" the "bomb" (because the hapless Cromitie, despite his "training," could not figure out how to do it); and told Cromitie how to place the device, while David Williams, Onta Williams and Payen performed lookout duty. As soon as the fake device was left by the community center door, law enforcement arrested the four men.

4

The purported attack on Stewart AFB using "stinger missiles" (never carried out, even in the carefully faked manner of the Bronx operation) was added to the sting solely to subject the four men to the statutory mandatory minimum sentences of 25 years.[3] After the men were convicted, that sentence was imposed. The court said at the time: "There is no doubt in my mind that the mandatory minimum sentence I must impose here . . . which is 25 years, is sufficient, *probably greater than necessary*, to punish you for what happened here and for what did not happen here." *See* Sentencing Transcript for Laguerre Payen, 9/7/11, at 21 (Emphasis Added).[4] However, my hands were tied.

The defendants challenged their sentence, in post-trial motions and on appeal, as the product of governmental sentencing manipulation. This court reluctantly concluded, in a decision affirmed by the Second Circuit, that there was no such thing as "sentencing entrapment," so the sentence, while unjust, was legal. *United States v. Cromitie*, No. 09 CR. 558 CM, 2011 WL 2693297 (S.D.N.Y. June 29, 2011), *aff'd*, 727 F.3d 194 (2d Cir. 2013).

All direct appeals and collateral attacks on their convictions (challenged principally as entrapment) and their sentences failed.

Cromitie has served 15 years of his 25-year mandatory minimum sentence. His projected release date is October 5, 2030. This is his first motion for compassionate release.

Compassionate Release

Under 18 U.S.C. § 3582(c)(1)(A)(i), *as amended by the First Step Act*, a court "may not modify a term of imprisonment once it has been imposed," except under limited circumstances. One such circumstance is the so-called compassionate release provision, which provides that a

---

[3] The Conspiracy (Count 5) and Attempt (Count 6) to Acquire and Use Anti-Aircraft Missiles counts carried a mandatory 25-year minimum sentence.

[4] The statement applied to all four defendants.

5

district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling circumstances." § 3582(c)(1)(A)(i). A motion under this provision may be made by either the Bureau of Prisons or a defendant (prior to the First Step Act of 2018, only the BOP could initiate a compassionate release motion on behalf of a defendant), but in the latter case only "after the defendant has *fully exhausted all administrative rights* to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* (emphasis added). Thus, where a compassionate release motion is brought by a defendant who has not "fully exhausted all administrative rights," the district court "may not" modify his term of imprisonment. If, however, a defendant demonstrates that he has exhausted his administrative remedies with the BOP, the Court must then consider whether the defendant has met his burden of establishing "extraordinary and compelling circumstances" warranting release.[5]

Congress has historically tasked the United States Sentencing Commission with providing guidance on what circumstances could be considered sufficiently extraordinary and compelling to justify a reduction in sentence. *United States v. O'Bryant*, No. 16 CR. 0317-3 (PAE), 2023 WL 8447995, at *4 (S.D.N.Y. Dec. 6, 2023), citing *United States v. Brooker*, 976 F.3d 228, 232 (2d Cir. 2020). Before November 1, 2023, the Sentencing Commission's only guidance on this point had been promulgated prior to the enactment of the First Step Act. This guidance thus applied only to a "motion of the Director of the Bureau of Prisons," *see* U.S.S.G. § 1B1.13 (historical note), and not "to compassionate release motions brought by defendants." *Id.* citing *Brooker*, 976 F.3d at 236. Accordingly, the Second Circuit held in 2020, the guidance "[could not] constrain district

---

[5] "A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue." *See, e.g., United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992).

6

courts' discretion to consider whether any reasons [were] extraordinary and compelling" in such cases. *Id.*; *see also id.* at 237 ("Neither Application Note 1 (D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion.").

On November 1, 2023, the Sentencing Commission amended the Guidelines so that it now provides guidance for courts in deciding petitions initiated by both BOP and defendants. *See generally* U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines, 88 Fed. Reg. 28,254 (effective Nov. 1, 2023). The Commission also tweaked the Guidelines language— expanding in part and clarifying the commission's guidance on what might constitute extraordinary and compelling circumstances warranting a reduction in sentence. The Commission identifies six categories of circumstances that, singly or in combination, may qualify as extraordinary and compelling:

(1) Medical circumstances of the defendant. U.S.S.G. § 1B1.13(b)(1). In addition to previously recognized circumstances such as a defendant suffering from a terminal illness or a serious medical condition, id. § 1B1.13(b)(1)(A)–(B), the amended guidelines direct courts to consider whether the defendant is "suffering from a medical condition that requires long-term or specialized medical care" that is not being provided in prison and without which the defendant is at risk of serious health deterioration or death, id. § 1B1.13(b)(1)(C), or is held at a facility affected by or at imminent risk of being affected by an outbreak of infectious disease or other "ongoing public health emergency declared by the appropriate federal, state, or local authority," where "due to personal health risk factors and custodial status," the defendant is at a greater risk of severe complications upon exposure, and where "such risk cannot be adequately mitigated in a timely manner." Id. § 1B1.13(b)(1)(D).

(2) Age of the defendant. When coupled with a deterioration in physical or mental health that corresponds with the aging process, this can support sentence reduction. U.S.S.G. § 1B1.13(b)(2).

(3) Family circumstances of the defendant. Where the defendant is the "only available caregiver" for an immediate family member, this may support a sentence reduction. See id. § 1B1.13(b)(3).

(4) Victim of Abuse. Where the defendant, while in custody on the sentence in question was a victim of sexual abuse, or physical abuse resulting in serious bodily injury, "committed by, or at the direction of, a correctional officer, an employee or contractor of the Bureau of Prisons, or any other individual who had custody or control over the defendant," and the misconduct was "established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding," this may support a sentence reduction. Id. § 1B1.13(b)(4).

(5) Other Reasons. Where "[t]he defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4). Id. § 1B1.13(b)(5).

(6) Unusually long sentence. Where "a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the

8

sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances." U.S.S.G. § 1B1.13(b)(6).

Importantly, the Commission retained the "other reasons" category, recognizing that it could not possibly identify the myriad extraordinary and compelling reasons that might warrant a sentence reduction.

> The Commission considered but specifically rejected a requirement that "other reasons" be similar in nature and consequence to the specified reasons. Rather, they need be *similar only in gravity*, a requirement that inheres in the statutory requirement that they present extraordinary and compelling reasons for a sentence reduction. *See* 18 U.S.C. § 3582(c)(1)(A).
>
> The Commission recognized that during the period between the enactment of the First Step Act in 2018 and this amendment, district courts around the country, based sentence reductions on dozens of reasons and combinations of reasons. Based on a careful review of those cases, the Commission continues to believe what is stated in Application Note 4 to the current policy statement, i.e., *that judges are "in a unique position to determine whether the circumstances warrant a reduction." Guidance beyond that provided in the amended policy statement regarding what circumstances or combination of circumstances are sufficiently extraordinary and compelling to warrant a reduction in sentence is best provided by reviewing courts, rather than through an effort by the Commission to predict and specify in advance all of the grounds on which relief may be appropriate.*

The United States Sentencing Commission, Amendments to the Sentencing Guidelines, Effective Date November 1, 2023, https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf. (Emphasis added). The Commission's recognition of its limitations in this regard, and the deference to be shown to the courts who must ultimately decide whether extraordinary and compelling circumstances exist in any given case, is wholly consistent with the Second Circuit's unqualified declaration in *Brooker* that: "District courts have discretion to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [the court] in motions for compassionate release." *See Brooker*, 976 F.3d at 237.

Finally, neither the recent amendment to the Guidelines nor *Brooker* changed the mandate in § 3582(c)(1)(A)(i) that a court contemplating a defendant's release pursuant to that section must also consider the sentencing factors at 18 U.S.C. § 3553(a), to the extent they remain applicable, and determine whether they counsel for or against release. A court always retains discretion to deny a motion for compassionate release if, in its view, the § 3553(a) factors override what would otherwise present extraordinary and compelling circumstances for release.

<u>Cromitie Exhausted His Administrative Remedies in the Bureau of Prisons</u>

Cromitie filed a written request with the Warden at his facility, FCI Allenwood Medium, that the BOP make a motion for compassionate release on his behalf. His request was denied on August 25, 2023. Accordingly, the Court finds that Cromitie has exhausted his administrative remedies under 18 USC 3582(c)(1)(A), and his motion for compassionate release is properly before the Court.

**<u>Cromitie's Motions is Granted Because Extraordinary and Compelling Circumstances Exist and the 3553(a) Factors Do Not Counsel Against Release</u>**

1. *The Severity of Cromitie's Sentence Relative to His Actual Criminal Behavior—Which Was Entirely the Product of the Government's Conduct--Qualifies as An Extraordinary and Compelling Circumstance Warranting Compassionate Relief*

The analysis and conclusions announced in the Court's decision granting the codefendants' motions for compassionate release apply with equal force to Cromitie's motion. *See United States v. Williams*, No. 09 CR 558 (CM), 2023 WL 4785286 (S.D.N.Y. July 27, 2023). Accordingly, the Court incorporates the *Williams* decision by reference, in its entirety, *see id.*, including my conclusions that: (1) compassionate release under the First Step Act may be granted for *any* extraordinary and compelling reason, other than one that collaterally attacks the validity of the underlying conviction. *United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020); (2) the fact that the

10

sentence imposed was a mandatory minimum does not preclude compassionate release, *see United States v. Snype*, 441 F.3d 119 (2d Cir. 2006); (3) the severity of a defendant's sentence relative to his actual criminal behavior may, under certain circumstances, present an extraordinary and compelling reason to consider granting compassionate releases, *see, e.g., United States v. Vargas*, 502 F. Supp. 3d 820, 826–27 (S.D.N.Y. 2020) (collecting cases); (4) the Government's role in designing a sting operation that mandates a draconian mandatory-minimum sentence may constitute an extraordinary and compelling reason to grant a compassionate release motion, *see ex. United States v. Conley*, 2021 U.S. Dist. LEXIS 40763 at 5 (N.D. Ill. 2021); *United States v. Lewis*, 641 F.3d 773, 777 (7th Cir. 2011); *United States v. Kindle*, 698 F.3d 401, 414 (7th Cir. 2012); and (5) nothing in the Sentencing Commission November 1, 2023 Guidelines amendments (which were not yet in effect, but which the Government invoked) precludes relief in the circumstances of this case, *see supra* at 9. Applying those legal conclusions to Cromitie's motion yields the same result.

As I stated when granting the codefendants' motions: Nothing could be more certain than the fact that Cromitie and his codefendants would not have, and could not have, devised on their own a crime involving missiles that would have warranted the 25-year sentence the court was forced to impose. *See United States v. Cromitie*, 727 F.3d 194 (2d Cir. 2013). Then Chief Judge Jacobs, who would have overturned Cromitie's (and only Cromitie's) conviction on entrapment grounds, said it best: "It is clear that Cromitie in his unmolested state of grievance would (for all the evidence shows, and as the district court found) have continued to stew in his rage and ignorance indefinitely, and had no formed design about what to do. The government agent supplied a design and gave it form, so that the agent rather than the defendant inspired the crime, provoked it, planned it, financed it, equipped it, and furnished the time and targets. He had to, because

11

Cromitie was comically incompetent, possibly the last candidate one would pick as the agent of a conspiracy." *Id* at 230. Had the Government not contrived its elaborate sting operation, it is highly likely that Cromitie would have lived out his life in Newburgh, quite possibly cycling in and out of jail for a string of petty offenses, but never committing a crime remotely like the ones for which he has been sitting in a federal penitentiary for 15 years. My misgivings about how the Government ensnared and then arranged things so that these men could be charged with crimes that carried a 25 year mandatory minimum factored significantly in my decision not to sentence them to more than the mandatory minimum (their Guideline, predictably, was life). I was fully aware, at the time the sentence was imposed, that it did not accord with the so-called "parsimony clause" in 18 U.S.C. § 3553(a); as noted above, I said so.

The Government attempts to distinguish Cromitie from the other defendants, suggesting that 25 years was not an excessive sentence for Cromitie, even if it was excessive as to the other defendants. The distinctions upon which the Government relies are unconvincing.

The Government argues, for example, that Cromitie was involved in the scheme "far longer" than the others. But it does not admit that Cromitie did nothing that violated the law—not even make plans to violate the law—during the extra months that he was subjected to Hussain's repeated inveigling Nor does the Government acknowledge that Cromitie spent a considerable portion of that "extra time" hiding from the informant in order to escape the pressure he was under. And while Cromitie did technically "recruit" the co-defendants, he did so at the behest of Hussain, who urged (badgered) him to involve others, solely that the Government created conspiracy would be legally possible.

The notion that Cromitie was selected as a "leader" by the co-defendants is inconceivable, given his well-documented buffoonery and ineptitude. That ineptitude extended to his

12

manipulation of the Government-made fake bombs, which Cromitie was unable to "arm" despite being shown how to do it by the informant. The Government selected Cromitie, pressured Cromitie, and anointed him as its vessel—the "leader" of its conspiracy. The Government believes that Cromitie had a more significant role in the offense, but to the rest of the world, and certainly to this Court, it appears that the Government selected the most expendable, most pathetic, least capable and least discerning individual it could find and then used him in the scheme it designed.

The Government makes a point of Cromitie's use of vile antisemitic language. But the Government does not mention the fact that its informant, who started the conversation, repeatedly employed the same vile antisemitic language, and encouraged Cromitie to respond in kind. The language was disgusting, to be sure, but just as, if not more, disgusting coming out of the mouth of one who was effectively the Government. Moreover, words alone, no matter how vile, do not justify the 25-year sentence the Court had to impose on Cromitie.

Finally – and predictably – the Government argues that the Court cannot reduce Cromitie's sentence on the ground that it is overly long, because the Guidelines amendments that went into force and effect as of November 1, 2023—after the codefendants' motion was decided, but before Cromitie's motion was fully briefed—bar the reduction of an overly long sentence in the absence of some change in law that would make a similar sentence shorter, if imposed today. *See ex.*, *United States v. Watts*, No. 92-CR-767 (KAM), 2023 WL 35029, at *7 (E.D.N.Y. Jan. 4, 2023) (District courts in the Second Circuit have reduced sentences where the defendant's original sentence was enhanced by the § 924 stacking provision.); citing, *United States v. Ballard*, 552 F. Supp. 3d 461, 467 (S.D.N.Y. 2021)("The Court therefore holds that the First Step Act's elimination of sentence "stacking" under § 924(c) constitutes an extraordinary and compelling

13

circumstance warranting reduction in the sentence of a defendant who was subject to this abolished punishment."); *United States v. Redd*, 2020 WL 1248493 at *8, n.18 (collecting cases regarding the court's authority to reduce a sentence based on the severity of "stacked" § 924(c) sentences). *United States v. Viola*, No. 91 CR 800 (S. Johnson), 2021 WL 4592768, at *4 (E.D.N.Y. Oct. 6, 2021) ("The extraordinary and compelling circumstances underlying these district court decisions are fairly uniform ... [including] the Circuit's invitation to 'consider' what the defendant's sentence would have been but for the mandatory minimums or other changes brought about by the First Step Act ... and the presence of 924(c) 'stacking.'").

The court acknowledges that Cromitie's motion is subject to the Guidelines currently in force— even though his co-defendants' motions were subject to the pre-November 1 Guidelines. If the basis for reducing Cromitie's sentence were simply that it was overly long (category 6), I could not grant the motion, because the law relating to the mandatory minimum sentence for Counts 5 (Conspiracy to Acquire and Use Anti-Aircraft Missiles) and Count 6 (Attempt to Acquire and Use Anti-Aircraft Missiles) has not changed since Cromitie's 25 year sentence was imposed.

But the Government misapprehends the ground on which Cromitie moves. He does not invoke category 6 (unusually long sentence), but rather category 5, which allows the court to reduce a sentence for "any other reason of similar gravity to the listed reasons." Being the object of a seven month long Government pressure campaign to participate in a Government-planned and Government-executed "un-terrorist" operation—one specifically designed by the Government to ensure the imposition of a manifestly unjust and excessive 25 year sentence on a Falstaffian buffoon—qualifies, in the opinion of this Court, as a reason of similar gravity to reasons such as a defendant's age, medical condition, or his family's situation. In fact, it is a

reason of far greater gravity. I said as much when I granted the co-defendants' motions, and I repeat my statement here. The Government's conduct *vis a vis* James Cromitie in this case—conduct it has never repeated *vis a vis* any other human being, and with good reason—was designed to result, and did result, in the imposition of a sentence that was both unjust and greater than necessary to redress any criminal behavior in which Cromitie engaged. This means the Government forced the court to violate the parsimony clause enshrined in 18 USC § 3553(a). That qualifies as an extraordinary and compelling circumstance; one that justifies reducing Cromitie's sentence as a matter of the court's compassion. Indeed, I can think of no defendant whom I have sentenced in my 25 years on the federal bench who is more deserving of the court's compassion than James Cromitie.

The Court thus concludes that there are extraordinary and compelling reason for this Court to consider reducing Cromitie's sentence, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). That is true whether category 5 is considered by itself or in a "total mix" of factors.

2.  *Cromitie Has Identified Other Reasons to Support Consideration of His Request for Compassionate Release*

In addition to his argument about overly harsh sentences, Cromitie suggests (as did his codefendants in their motions) that there are additional reasons that he believes are sufficiently extraordinary and compelling to warrant release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). He argues that the difficult conditions of confinement that he had endured during the COVID-19 pandemic, his chronic health issues, and his demonstrated rehabilitation, all counsel in favor of release. He suggests that while no single one of these additional reason—considered independently of the others—may necessarily warrant granting release, when considered in the aggregate they satisfy the "extraordinary and compelling" standard.

Health Matters & COVID-19

Cromitie is now 58 years old. BOP medical records reflect that he suffers from diabetes, hyperlipidemia, hypertension and chronic kidney disease. However, his BOP medical records also show that the Bureau's medical staff is successfully treating all of Cromitie's medical conditions. Just last year, BOP arranged for Cromitie to have a lesion surgically removed and has been providing him with follow-up treatment for post-operative complications. While better medical treatment is almost always available outside of prison walls, BOP records suggest that Cromitie is receiving satisfactory medical care. Cromitie's poor health—such as it is—is not alone an extraordinary and compelling reason to grant release.

Cromitie says that he fears that his diabetic condition will make him more susceptible to Covid-19 and put him at high risk of suffering a severe outcome should he contract the virus.

COVID-19 is far from the dreaded killer that arrived on our shores in 2020. On May 11, 2023, the Center for Disease Control declared the COVID-19 public health emergency ended. The CDC has now shifted from an emergency response posture "to incorporating COVID-19 activities into sustainable public health practice." *End of the Federal COVID-19 Public Health Emergency (PHE) Declaration*, https://www.cdc.gov/coronavirus/2019-ncov/your-health/end-of-phe.html. The incidence of COVID-19 infections throughout the Bureau of Prisons has dropped significantly; BOP is currently reporting zero cases at the FCI Allenwood. *See BOP COVID-19 Statistics*, https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp. (Last visited January 11, 2024).

Although the incidence of COVID-19 infection has spiked somewhat during these winter month, the ubiquitous availability of the COVID-19 vaccination and treatment options for those

16

who do become infected, has eliminated COVID-19 as a basis for granting compassionate release; even for those persons whom the CDC has in the past said were at risk of suffering a severe outcome if they were to become infected— a category into which Cromitie might arguably fall.

That said, the pandemic was extremely hard on prisoners. The necessary steps that the BOP undertook to stop the spread of the deadly virus—lockdowns, suspension of programs, and curtailed visitation—led to increased prisoner isolation and fewer program opportunities for inmates. This created harsher than usual conditions of confinement, which is a factor the court can and does consider in deciding whether extraordinary and compelling circumstances warrant granting compassionate release for a COVID-19 era inmate. Cromitie was no less subject to these conditions then were his codefendants, whose motions were granted, in part on this basis.

Rehabilitation While Incarcerated

Finally, Cromitie asserts in his moving papers that "he has taken significant strides toward becoming a better man," and "hopes to live the rest of his life in freedom." He reportedly has been employed in prison as a cook and other jobs in the kitchen at Allenwood. He has attended numerous classes, received certificates for completing self-improvement programs, and represents that he is close to obtaining his GED. He has reportedly also taught art classes.

Cromitie's disciplinary record is not perfect: He has received various tickets for minor infractions. But he has no infractions since 2013— ten long years ago. That is a promising trend.

Cromitie says that he has reestablished a relationship with his girlfriend Kathleen, who (according to counsel) is devoted to Cromitie and will keep him on track if and when he is released. Counsel says that:

> [His client] "expects, indeed wants, to work and to steer clear of trouble and the disreputable characters with whom he associated before he went to prison. Adherence to his faith will keep him away from them and away from drugs and

17

alcohol. James Cromitie 2.0 is a better version of himself. Supervision and his own determination will show that his rehabilitation is genuine. He is not the old James Cromitie anymore.

(Def. Br. at 6).

The Government argues that, in contrast to his co-defendants, Cromitie offers no letters of support from friends, family, or others, nor any letter of his own accepting responsibility, or expressing remorse, for his actions. While the Court has seen more fulsome presentations in this regard, Cromitie's lack of any disciplinary infractions since 2013, and the credible representation of Cromitie's turnaround by counsel, suggest to the Court that the 15 years Cromitie has served in prison have indeed changed him for the better, and that he will finally, at 58 years of age, settle into the community as a law abiding citizen.

And while rehabilitation alone cannot form the basis for granting release or a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A)(i), it can bolster arguments for a finding of extraordinary and compelling circumstances made on other grounds—in this case, an unjust Government engineered sentence coupled with the harsh conditions of confinement that defendant endured during the pandemic.

3.   *The Section 3553(a) Factors Do Not Counsel Against Granting the Defendant's Motion.*

The fact that Cromitie has pointed to extraordinary and compelling reasons why he could qualify for compassionate release is not enough. The court must also be satisfied that the sentencing factors set forth at 18 U.S.C. § 3553(a)—that the sentence reflect the nature and circumstances of the offense, the defendant's personal characteristics, the need to provide specific and general deterrence, and to promote respect for the law—are consistent with any contemplated reduction.

They are – far more than they were at the time of the original sentencing.

Because of the mandatory minimum, the 3553(a) factors were virtually irrelevant when the moving defendants were originally sentenced. The court concluded long ago, and announced at the time of sentencing, that the sentences being imposed solely as a result of governmental contrivance exceeded anything required by the parsimony clause. As heinous as was Cromitie's agreement to participate in what the FBI and Hussain had cooked up was—and make no mistake, it was heinous—he was sentenced for participating in a fictitious plot to do things that he could never have dreamed up on his own, and that were never going to happen.

The 15 years that Cromitie has already served is at the upper end of what the court would have imposed if it had been free to fashion a sentence that accurately reflected the nature and circumstance of the offense and the history and characteristics of the impoverished and susceptible criminal who committed it. A decade and a half in prison, the last few years under conditions harsher than anything imagined by the court at the time of sentencing, is more than sufficient to provide deterrence and promote respect for the law. As far as this court is concerned, the only thing connected to this case that undermined anyone's respect for the law was the Government's questionable decision to send a villain like Hussein to troll among the poorest and weakest of men for "terrorists" who might prove susceptible to an offer of much-needed cash in exchange for committing a faux crime.

Cromitie has received counseling, self-improvement programs and vocational training already while in prison. No further services in a prison setting are needed.

In sum, the 3553(a) factors, far from being an impediment to granting the defendants' motions, counsel strongly in favor of granting them.

## CONCLUSION

Cromitie's motion for a sentence reduction (Dkt. No. 277) is GRANTED. His sentence is reduced to time served plus 90 days. The court will notify Probation immediately, because it will be necessary to accelerate the preparation of release plans for this long-incarcerated defendant. The Clerk of Court is directed to remove the motion from the Court's list of open motions.

Dated: New York, New York
       January 19, 2024

_____
Colleen McMahon
United States District Court Judge

BY ECF TO ALL COUNSEL